# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 19, 2013          Decided July 2, 2013

No. 12-5204

ASSOCIATION OF AMERICAN RAILROADS,
APPELLANT

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01499)

*Thomas H. Dupree, Jr.* argued the cause for appellant. With him on the briefs was *Louis P. Warchot.*

*Michael S. Raab*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, *Mark B. Stern* and *Daniel Tenny*, Attorneys, *Paul M. Geier*, Assistant General Counsel for Litigation, U.S. Department of Transportation, *Peter J. Plocki*, Deputy Assistant General Counsel for Litigation, and *Joy Park*, Attorney.

Before: BROWN, *Circuit Judge*, and WILLIAMS and SENTELLE, *Senior Circuit Judges*.

BROWN, *Circuit Judge*: Imagine a scenario in which Congress has given to General Motors the power to coauthor, alongside the Department of Transportation, regulations that will govern all automobile manufacturers. And, if the two should happen to disagree on what form those regulations will take, then neither will have the ultimate say. Instead, an unspecified arbitrator will make the call. Constitutional? The Department of Transportation seems to think so.[1]

Next consider a parallel statutory scheme—the one at issue in this case. This time, instead of General Motors, it is Amtrak (officially, the "National Railroad Passenger Corporation") wielding joint regulatory power with a government agency. This new stipulation further complicates the issue. Unlike General Motors, Amtrak is a curious entity that occupies the twilight between the public and private sectors. And the regulations it codevelops govern not the automotive industry, but the priority freight railroads must give Amtrak's trains over their own. Whether the Constitution permits Congress to delegate such joint regulatory authority to Amtrak is the question that confronts us now.

Section 207 of the Passenger Rail Investment and Improvement Act of 2008 empowers Amtrak and the Federal Railroad Administration (FRA) to jointly develop performance measures to enhance enforcement of the statutory priority Amtrak's passenger rail service has over

---

[1] Counsel for the Appellees embraced precisely this position at oral argument, albeit with some preliminary hemming and hawing. *See* Oral Arg. 30:20–33:00.

other trains. The Appellant in this case, the Association of American Railroads (AAR), is a trade association whose members include the largest freight railroads (known in the industry as "Class I" freight railroads), some smaller freight railroads, and—as it happens—Amtrak. Compl. ¶ 10, at 4. Challenging the statutory scheme as unconstitutional, AAR brought suit on behalf of its Class I members against the four Appellees—the Department of Transportation, its Secretary, the FRA, and its Administrator (collectively, the "government"). *Id.* ¶¶ 14–17, at 6–7. We conclude § 207 constitutes an unlawful delegation of regulatory power to a private entity.

I

A

To reinvigorate a national passenger rail system that had, by mid-century, grown moribund and unprofitable, Congress passed the Rail Passenger Service Act of 1970, Pub. L. No. 91-518, 84 Stat. 1327. *See Nat'l R.R. Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 453–54 (1985). Most prominently, the legislation created the passenger rail corporation now known as Amtrak, which would "employ[] innovative operating and marketing concepts so as to fully develop the potential of modern rail service in meeting the Nation's intercity passenger transportation requirements." Rail Passenger Service Act, § 301, 84 Stat. at 1330. The act also made railroad companies languishing under the prior regime an offer they could not refuse: if these companies consented to certain conditions, such as permitting Amtrak to use their tracks and other facilities, they could shed their cumbersome common carrier obligation to offer intercity passenger service. *See Nat'l R.R. Corp.*, 470 U.S. at 455–56.

Pursuant to statute, Amtrak negotiates these arrangements with individual railroads, the terms of which are enshrined in Operating Agreements.[2] *See* 49 U.S.C. § 24308(a). Today, freight railroads own roughly 97% of the track over which Amtrak runs its passenger service.

Naturally, sharing tracks can cause coordination problems, which is why Congress has prescribed that, absent an emergency, Amtrak's passenger rail "has preference over freight transportation in using a rail line, junction, or crossing." *Id.* § 24308(c). More recently, this same concern prompted enactment of the Passenger Rail Investment and Improvement Act of 2008 ("PRIIA"), Pub. L. No. 110-432, Div. B, 122 Stat. 4848, 4907. At issue in this case is the PRIIA's § 207, which directs the FRA and Amtrak to "jointly . . . develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations, including cost recovery, on-time performance and minutes of delay, ridership, on-board services, stations, facilities, equipment, and other services." PRIIA § 207(a), 49 U.S.C. § 24101 (note). If Amtrak and the FRA disagree about the composition of these "metrics and standards," either "may petition the Surface Transportation Board to appoint an arbitrator to assist the parties in resolving their disputes through binding arbitration." *Id.* § 207(d), 49 U.S.C. § 24101 (note). "To the extent practicable," Amtrak and its host rail carriers must incorporate the metrics and standards into their Operating Agreements. *Id.* § 207(c), 49 U.S.C. § 24101 (note).

---

[2] If the parties cannot reach agreement, the Surface Transportation Board (STB) will "order that the facilities be made available and the services provided to Amtrak" and "prescribe reasonable terms and compensation." 49 U.S.C. § 24308(a).

Though § 207 provides the means for devising the metrics and standards, § 213 is the enforcement mechanism. If the "on-time performance" or "service quality" of any intercity passenger train proves inadequate under the metrics and standards for two consecutive quarters, the STB may launch an investigation "to determine whether and to what extent delays or failure to achieve minimum standards are due to causes that could reasonably be addressed by a rail carrier over whose tracks the intercity passenger train operates or reasonably addressed by Amtrak or other intercity passenger rail operators." PRIIA § 213(a), 49 U.S.C. § 24308(f)(1). Similarly, if "Amtrak, an intercity passenger rail operator, a host freight railroad over which Amtrak operates, or an entity for which Amtrak operates intercity passenger rail service" files a complaint, the STB "*shall*" initiate such an investigation. *Id.* (emphasis added). Should the STB determine the failure to satisfy the metrics and standards is "attributable to a rail carrier's failure to provide preference to Amtrak over freight transportation as required," it may award damages or other relief against the offending host rail carrier. *Id.* § 24308(f)(2).

B

Following § 207's mandate, the FRA and Amtrak jointly drafted proposed metrics and standards, which they submitted to public comment on March 13, 2009. *See Metrics and Standards for Intercity Passenger Rail Service Under Section 207 of Public Law 110-432*, 74 Fed. Reg. 10,983 (Mar. 13, 2009). The proposal attracted criticism, with much vitriol directed at three metrics formulated to measure on-time performance: "effective speed" (the ratio of route's distance to the average time required to travel it), "endpoint on-time

performance" (the portion of a route's trains that arrive on schedule), and "all-stations on-time performance" (the degree to which trains arrive on time at each station along the route). AAR, among others, derided these metrics as "unrealistic" and worried that certain aspects would create "an excessive administrative and financial burden." The FRA responded to the comments, and a final version of the metrics and standards took effect in May 2010. *See Metrics and Standards for Intercity Passenger Rail Service Under Section 207 of the Passenger Rail Investment and Improvement Act of 2008*, 75 Fed. Reg. 26,839 (May 11, 2010).

AAR filed suit on behalf of its Class I freight railroad members, asking the district court to declare § 207 of the PRIIA unconstitutional and to vacate the promulgated metrics and standards. The complaint asserted two challenges: that § 207 unconstitutionally delegates to Amtrak the authority to regulate other private entities; and that empowering Amtrak to regulate its competitors violates the Fifth Amendment's Due Process Clause. Compl. ¶¶ 47–54, at 16–17. The district court rejected these arguments, granting summary judgment to the government and denying it to AAR. *See AAR v. Dep't of Transp.*, 865 F. Supp. 2d 22, 35 (D.D.C. 2012). AAR renews these constitutional claims on appeal.

II

AAR's argument takes the following form: Delegating regulatory authority to a private entity is unconstitutional. Amtrak is a private entity. Ergo, § 207 is unconstitutional. This proposed syllogism is susceptible, however, to attacks on both its validity and soundness. In other words, does the conclusion actually follow from the premises? And, if it does, are both premises true? Our discussion follows the same path.

7

A

We open our discussion with a principle upon which both sides agree: Federal lawmakers cannot delegate regulatory authority to a private entity. To do so would be "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). This constitutional prohibition is the lesser-known cousin of the doctrine that Congress cannot delegate its legislative function to an agency of the Executive Branch. *See* U.S. CONST. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States . . . ."); *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). This latter proposition finds scarce practical application, however, because "no statute can be entirely precise," meaning "some judgments, even some judgments involving policy considerations, must be left to the officers executing the law and to the judges applying it." *Mistretta v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting). All that is required then to legitimate a delegation to a government agency is for Congress to prescribe an intelligible principle governing the statute's enforcement. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

Not so, however, in the case of private entities to whom the Constitution commits no executive power. Although objections to delegations are "typically presented in the context of a transfer of legislative authority from the Congress to agencies," we have reaffirmed that "the difficulties sparked by such allocations are even more prevalent in the context of agency delegations to private individuals." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC* ("*NARUC*"), 737 F.2d

1095, 1143 (D.C. Cir. 1984) (per curiam). [3] Even an intelligible principle cannot rescue a statute empowering private parties to wield regulatory authority. Such entities may, however, help a government agency make its regulatory decisions, for "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality" that such schemes facilitate. *Pan. Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935). Yet precisely how much involvement may a private entity have in the administrative process before its advisory role trespasses into an unconstitutional delegation? Discerning that line is the task at hand.

Preliminarily, we note the Supreme Court has never approved a regulatory scheme that so drastically empowers a private entity in the way § 207 empowers Amtrak. True, § 207 has a passing resemblance to the humbler statutory frameworks in *Currin v. Wallace*, 306 U.S. 1 (1939), and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940). In *Currin* Congress circumscribed its delegations of

---

[3] At least one commentator has suggested that the "doctrine forbidding delegation of public power to private groups is, in fact, rooted in a prohibition against self-interested regulation that sounds more in the Due Process Clause than in the separation of powers." A. Michael Froomkin, *Wrong Turn in Cyberspace: Using ICANN To Route Around the APA and the Constitution*, 50 DUKE L.J. 17, 153 (2000). *Carter Coal* offers some textual support for this position, describing the impermissible delegation there as "clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment." 298 U.S. at 311. While the distinction evokes scholarly interest, neither party before us makes this point, and our own precedent describes the problem as one of unconstitutional delegation. *See NARUC*, 737 F.2d at 1143 n.41. And, in any event, neither court nor scholar has suggested a change in the label would effect a change in the inquiry.

administrative authority—in that case, by requiring two thirds of regulated industry members to approve an agency's new regulations before they took effect. *See* 306 U.S. at 6, 15. *Adkins*, meanwhile, affirmed a modest principle: Congress may formalize the role of private parties in proposing regulations so long as that role is merely "as an aid" to a government agency that retains the discretion to "approve[], disapprove[], or modif[y]" them. 310 U.S. at 388. Like the private parties in *Currin*, Amtrak has an effective veto over regulations developed by the FRA. And like those in *Adkins*, Amtrak has a role in filling the content of regulations. But the similarities end there. The industries in *Currin* did not craft the regulations, while *Adkins* involved no private check on an agency's regulatory authority. [4] Even more damningly, the agency in *Adkins* could unilaterally change regulations proposed to it by private parties, whereas Amtrak enjoys authority equal to the FRA. Should the FRA prefer an alternative to Amtrak's proposed metrics and standards, § 207 leaves it impotent to choose its version without Amtrak's permission. No case prefigures the unprecedented regulatory powers delegated to Amtrak. [5]

---

[4] For what it is worth, *Currin* also involved the collective participation of two thirds of industry members, and the regulations in *Adkins* arose from district boards comprising multiple members of the regulated industry. Neither upheld a statute that favored a single firm over all its market rivals.

[5] The government also cites various decisions from other Circuits that purportedly support its position. All are distinguishable. Several upheld schemes like that in *Currin* in which the effect of regulations was contingent upon the assent of a certain portion of the regulated industry. *See Ky. Div., Horsemen's Benevolent and Protective Ass'n v. Turfway Park Racing Ass'n*, 20 F.3d 1406, 1416 (6th Cir. 1994); *Sequoia Orange Co. v. Yeutter*,

The government also points out that the metrics and standards themselves impose no liability. Rather, they define the circumstances in which the STB will investigate whether infractions are attributable to a freight railroad's failure to meet its preexisting statutory obligation to accord preference to Amtrak's trains. *See* PRIIA § 213(a), 49 U.S.C. § 24308(f). We are not entirely certain what to make of this argument. Taken to its logical extreme, it would preclude all preenforcement review of agency rulemaking, so it is probably unlikely the government is pressing so immodest a claim.[6] If

---

973 F.2d 752, 759 (9th Cir. 1992). The others resemble *Adkins* insofar as they approve structures in which private industry members serve in purely advisory or ministerial functions. *See Pittston Co. v. United States*, 368 F.3d 385, 394–97 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128–29 (3d Cir. 1989), *abrogated on other grounds by Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977); *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952). In none of these cases did a private party stand on equal footing with a government agency.

[6] AAR's Reply Brief treated this argument as an ordinary ripeness challenge. *See* Br. 18–21. If that is what the government intended, then we are not persuaded. As a purely legal question, § 207's constitutionality is appropriate for immediate judicial resolution. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). And depriving AAR of review at this stage would result in considerable hardship. *See United Christian Scientists v. Christian Sci. Bd. of Dirs., First Church of Christ, Scientist*, 829 F.2d 1152, 1160 n.29 (D.C. Cir. 1987). The record is replete with affidavits from the freight railroads describing the immediate actions the

the point is merely that the STB adds another layer of government "oversight" to Amtrak's exercise of regulatory power, this precaution does not alter the analysis. Government enforcement power did not save the rulemaking authority of the private coal companies in *Carter Coal*, nor the power of private landowners in *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116 (1928), to impose a zoning restriction on a neighbor's tract of land. As is often the case in administrative law, the metrics and standards lend definite regulatory force to an otherwise broad statutory mandate. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001). The preference for Amtrak's traffic may predate the PRIIA, but the metrics and standards are what channel its enforcement. Certainly the FRA and Amtrak saw things that way, responding to one public comment by noting the STB "is the primary enforcement body *of the standards*." J.A. 63 (emphasis added). Not only that, § 207 directs "Amtrak and its host carriers" to include the metrics and standards in their Operating Agreements "[t]o the extent practicable." PRIIA § 207(c), 49 U.S.C. § 24101 (note). The STB's involvement is no safe harbor from AAR's constitutional challenge to § 207.

As far as we know, no court has invalidated a scheme like § 207's, but perhaps that is because no parallel exists. Unprecedented constitutional questions, after all, lack clear and controlling precedent. We nevertheless believe *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 130 S. Ct. 3138 (2010), offers guidance. There the Supreme Court deemed it a violation of separation of powers to endow inferior officers with two layers of good-cause tenure

---

metrics and standards have forced them to take. *See* Decl. of Paul E. Ladue ¶¶ 6–9, at 3–5; Decl. of Mark M. Owens ¶ 9, at 4; Decl. of Virginia Marie Beck ¶¶ 9–11, at 4–6; Decl. of Peggy Harris ¶¶ 8–14, at 3–5.

insulating them from removal by the President. *See id.* at 3164. Two principles from that case are particularly resonant. To begin with, just because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute. *Free Enterprise Fund* deemed invalid a regime blending two limitations on the President's removal power that, taken separately, were unproblematic: the establishment of independent agencies headed by principal officers shielded from dismissal without cause, *see Humphrey's Ex'r v. United States*, 295 U.S. 602, 629–31 (1935), and the protection of certain inferior officers from removal by principal officers directly accountable to the President, *see Morrison v. Olson*, 487 U.S. 654, 691–93 (1988). *See* 130 S. Ct. at 3146–47. So even if the government is right that § 207 merely synthesizes elements approved by *Currin* and *Adkins*, that would be no proof of constitutionality.

As for the second principle, *Free Enterprise Fund* also clarifies that novelty may, in certain circumstances, signal unconstitutionality. That double good-cause tenure, for example, lacked an antecedent in the history of the administrative state was one reason to suspect its legality:

> "Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity. Neither the majority opinion nor the PCAOB nor the United States as intervenor has located any historical analogues for this novel structure. They have not identified any independent agency other than the PCAOB that is appointed by and removable only for cause by another independent agency."

*Id.* at 3159 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)); *accord Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2586 (2012). In defending § 207, the government revealingly cites no case—nor have we found any—embracing the position that a private entity may jointly exercise regulatory power on equal footing with an administrative agency. This fact is not trivial. Section 207 is as close to the blatantly unconstitutional scheme in *Carter Coal* as we have seen. The government would essentially limit *Carter Coal* to its facts, arguing that "[n]o more is constitutionally required" than the government's "active oversight, participation, and assent" in its private partner's rulemaking decisions. Appellee's Br. 19. This proposition—one we find nowhere in the case law—vitiates the principle that private parties must be limited to an advisory or subordinate role in the regulatory process.

To make matters worse, § 207 fails to meet even the government's ad hoc standard. Consider what would have happened if Amtrak and the FRA could not have reached an agreement on the content of the metrics and standards within 180 days of the PRIIA's enactment. Amtrak could have "petition[ed] the Surface Transportation Board to appoint an arbitrator to assist the parties in resolving their disputes through binding arbitration." PRIIA 207(d), 49 U.S.C. § 24101 (note). And nothing in the statute precludes the appointment of a private party as arbitrator.[7] That means it

---

[7] The government notes § 207's arbitration provision does not *require* the arbitrator be a private party. This is irrelevant. "[A]n agency can[not] cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." *Whitman*, 531 U.S. at 472. Nor does the canon of constitutional

would have been entirely possible for metrics and standards to go into effect that had not been assented to by a single representative of the government. Though that did not in fact occur here, § 207's arbitration provision still polluted the rulemaking process over and above the other defects besetting the statute. As a formal matter, that the recipients of illicitly delegated authority opted not to make use of it is no antidote. It is *Congress*'s decision to delegate that is unconstitutional. *See Whitman*, 531 U.S. at 473. As a practical matter, the FRA's failure to reach an agreement with Amtrak would have meant forfeiting regulatory power to an arbitrator the agency would have had no hand in picking. Rather than ensuring Amtrak would "function subordinately" to the FRA, *Adkins*, 310 U.S. at 399, this backdrop stacked the deck in favor of compromise. Even for government agencies, half an apple is better than none at all.

We remain mindful that the Constitution "contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). But a flexible Constitution must not be so yielding as to become twisted. Unless it can be established that Amtrak is an organ of the government, therefore, § 207 is an unconstitutional delegation of regulatory power to a private party.

B

avoidance offer a solution. The statute's text precludes the government's suggestion that we construe the open-ended language "an arbitrator" to include only federal entities. The constitutional avoidance canon is an interpretive aid, not an invitation to rewrite statutes to satisfy constitutional strictures. *Reno v. ACLU*, 521 U.S. 844, 884–85 (1997).

Now the crucial question: is Amtrak indeed a private corporation? If not—if it is just one more government agency—then the regulatory power it wields under § 207 is of no constitutional moment.

Many of the details of Amtrak's makeup support the government's position that it is not a private entity of the sort described in *Carter Coal*. Amtrak's Board of Directors includes the Secretary of Transportation (or his designee), seven other presidential appointees, and the President of Amtrak. *See* 49 U.S.C. § 24302(a). The President of Amtrak—the one Board member not appointed by the President of the United States—is in turn selected by the eight other members of the Board. *See id.* § 24303(a). Amtrak is also subject to the Freedom of Information Act. *See id.* § 24301(e). Amtrak's equity structure is similarly suggestive. As of September 30, 2011, four common stockholders owned 9,385,694 outstanding shares, which they acquired from the four railroads whose intercity passenger service Amtrak assumed in 1971. BDO USA, LLP, NATIONAL RAILROAD PASSENGER CORPORATION AND SUBSIDIARIES (AMTRAK) CONSOLIDATED FINANCIAL STATEMENTS: YEARS ENDED SEPTEMBER 30, 2011 AND 2010, at 18 (2011) (J.A. 351). At the same time, however, the federal government owned all 109,396,994 shares of Amtrak's preferred stock, each share of which is convertible into 10 shares of common stock. *Id.* at 17 (J.A. 350). And, all that stands between Amtrak and financial ruin is congressional largesse. *See id.* at 6 (J.A. 339).

That being said, Amtrak's legislative origins are not determinative of its constitutional status. Congress's power to charter private corporations was recognized early in our nation's history. *See McCulloch v. Maryland*, 17 U.S. (4

Wheat.) 316, 409 (1819). And, as far as Congress was concerned, that is exactly what it was doing when it created Amtrak. As Congress explained it, Amtrak "shall be operated and managed as a for-profit corporation" and "is not a department, agency, or instrumentality of the United States Government." 49 U.S.C. § 24301(a). We have previously taken Congress at its word and relied on this declaration in deciding whether the False Claims Act applies to Amtrak. *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 490 (D.C. Cir. 2004) ("Amtrak is not the Government."); *id.* at 491 ("Amtrak is Not the Government."); *id.* at 502 ("Amtrak is not the Government."). Amtrak agrees: "The National Railroad Passenger Corporation, also known as Amtrak, is not a government agency or establishment [but] a private corporation operated for profit." NAT'L R.R. PASSENGER CORP., FREEDOM OF INFORMATION ACT HANDBOOK 1 (2008). And, somewhat tellingly, Amtrak's website is www.amtrak.com—not www.amtrak.gov.

How to decide? Since, in support of its claim that Amtrak is a public entity, the government looks past labels to how the corporation functions, it is worth examining what functional purposes the public-private distinction serves when it comes to delegating regulatory power. We identify two of particular importance. First, delegating the government's powers to private parties saps our political system of democratic accountability. *See Mich. Gaming Opposition v. Kempthorne*, 525 F.3d 23, 34 (D.C. Cir. 2008) (Brown, J., dissenting in part). This threat is particularly dangerous where both Congress and the Executive can deflect blame for unpopular policies by attributing them to the choices of a private entity. *See NARUC*, 737 F.2d at 1143 n.41; *cf. New York v. United States*, 505 U.S. 144, 169 (1992) ("[W]here the Federal Government directs the States to regulate, it may be state

officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision."). This worry is certainly present in the case of § 207, since Congress has expressly forsworn Amtrak's status as a "department, agency, or instrumentality of the United States Government." 49 U.S.C. § 24301(a)(3). Dislike the metrics and standards Amtrak has concocted? It's not the federal government's fault—Amtrak is a "for-profit corporation." *Id.* § 24301(a)(2).

Second, fundamental to the public-private distinction in the delegation of regulatory authority is the belief that disinterested government agencies ostensibly look to the public good, not private gain. For this reason, delegations to private entities are particularly perilous. *Carter Coal* specifically condemned delegations made not "to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." 298 U.S. at 311. Partly echoing the Constitution's guarantee of due process, this principle ensures that regulations are not dictated by those who "are not bound by any official duty," but may instead act "for selfish reasons or arbitrarily." *Roberge*, 278 U.S. at 122. More recent decisions are also consistent with this view. *See Pittston Co.*, 368 F.3d at 398; *NARUC*, 737 F.2d at 1143–44; *Sierra Club v. Sigler*, 695 F.2d 957, 962 n.3 (5th Cir. 1983). Amtrak may not compete with the freight railroads for customers, but it does compete with them for use of their scarce track. Like the "power conferred upon the majority . . . to regulate the affairs of an unwilling minority" in *Carter Coal*, § 207 grants Amtrak a distinct competitive advantage: a hand in limiting the freight railroads' exercise of

their property rights over an essential resource. 298 U.S. at 311.

Because Amtrak must "be operated and managed as a for-profit corporation," 49 U.S.C. § 24301(a)(2), the fact that the President has appointed the bulk of its Board does nothing to exonerate its management from its fiduciary duty to maximize company profits. Also consistent with this purpose, "Amtrak is encouraged to make agreements with the private sector and undertake initiatives that are consistent with good business judgment and designed to maximize its revenues and minimize Government subsidies." *Id.* § 24101(d). Yet § 207 directs Amtrak and its host carriers to incorporate the metrics and standards in their Operating Agreements. *See id.* § 24101(c) note. So to summarize: Amtrak must negotiate contracts that will maximize its profits; those contracts generally must, by law, include certain terms; and Amtrak has the power to define those terms. Perverse incentives abound. Nothing about the government's involvement in Amtrak's operations restrains the corporation from devising metrics and standards that inure to its own financial benefit rather than the common good. And that is the very essence of the public-private distinction when a claim of unconstitutional delegation arises.

No discussion of Amtrak's status as a private or public institution would be complete, however, without an examination of the Supreme Court's decision in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995).[8]

---

[8] Strangely, the government's brief places almost no emphasis on *Lebron*. Perhaps this indicates the government's agreement with AAR's reading of the case. Whatever the reason for this near-silence, we think it important to address the Supreme Court's most explicit discussion of Amtrak's status.

There the Court held that Amtrak "is part of the Government for purposes of the First Amendment." *Id.* at 400. Otherwise, the majority cautioned, the government could "evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Id.* at 397. What the Court did not do in *Lebron* was conclude that Amtrak counted as part of the government for all purposes. On some questions—Does the Administrative Procedure Act apply to Amtrak? Does Amtrak enjoy sovereign immunity from suit?—Congress's disclaimer of Amtrak's governmental status is dispositive. *See id.* at 392; *Totten*, 380 F.3d at 491–92. This makes sense: Congress has the power to waive certain governmental privileges, like sovereign immunity, that are within its legislative control; but it cannot circumvent the Bill of Rights by simply dubbing something private.

Whether § 207 effects an unconstitutional delegation is a constitutional question, not a statutory one. But just because *Lebron* treated Amtrak as a government agency for purposes of the First Amendment does not dictate the same result with respect to all other constitutional provisions. To view *Lebron* in this way entirely misses the point. In *Lebron*, viewing Amtrak as a strictly private entity would have permitted the government to avoid a constitutional prohibition; in this case, deeming Amtrak to be just another governmental entity would allow the government to ignore a constitutional obligation. Just as it is impermissible for Congress to employ the corporate form to sidestep the First Amendment, neither may it reap the benefits of delegating regulatory authority while absolving the federal government of all responsibility for its exercise. The federal government cannot have its cake and eat it too. In any event, *Lebron*'s holding was comparatively narrow, deciding only that Amtrak is an agency of the United States for the purpose of the First Amendment. 513 U.S. at

394. It did not opine on Amtrak's status with respect to the federal government's structural powers under the Constitution—the issue here.

This distinction is more than academic. When *Lebron* contrasted "the constitutional obligations of Government" from "the 'privileges of the government,'" it was not drawing a distinction between questions that are constitutional from those that are not. Any "privilege" of the federal government must also be anchored in the Constitution. *Id.* at 399. As our federal government is one of enumerated powers, the Constitution's structural provisions are the source of Congress's power to act in the first place. *See United States v. Lopez*, 514 U.S. 549, 552 (1995); THE FEDERALIST NO. 45 (James Madison). And, generally speaking, these provisions authorize action without mandating it. Congress's power to regulate interstate commerce, for example, does not dictate the enactment of this or that bill within its proper scope. By contrast, individual rights are "affirmative prohibitions" on government action that become relevant "only where the Government possesses authority to act in the first place." *Nat'l Fed'n of Ind. Bus.*, 132 S. Ct. at 2577. While often phrased in terms of an affirmative prohibition, Congress's inability to delegate government power to private entities is really just a function of its constitutional authority not extending that far in the first place. In other words, rather than proscribing what Congress *cannot* do, the doctrine defines the limits of what Congress *can* do. And, by designing Amtrak to operate as a private corporation—to seek profit on behalf of private interests—Congress has elected to deny itself the power to delegate it regulatory authority under § 207. *Cf.* Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb to bb-4 (requiring, beyond what the Constitution mandates, that the federal government "not substantially

burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the restriction satisfies strict scrutiny).

We therefore hold that Amtrak is a private corporation with respect to Congress's power to delegate regulatory authority. Though the federal government's involvement in Amtrak is considerable, Congress has both designated it a private corporation and instructed that it be managed so as to maximize profit. In deciding Amtrak's status for purposes of congressional delegations, these declarations are dispositive. Skewed incentives are precisely the danger forestalled by restricting delegations to government instrumentalities. And as a private entity, Amtrak cannot be granted the regulatory power prescribed in § 207.

### III

We conclude § 207 of the PRIIA impermissibly delegates regulatory authority to Amtrak. We need not reach AAR's separate argument that Amtrak's involvement in developing the metrics and standards deprived its members of due process. Accordingly, the judgment of the district court is

*Reversed.*