Tatel, Circuit Judge, dissenting:
Two years ago, this court held that the Passenger Rail Investment and Improvement Act of 2008 (the "2008 Rail Act") "violates due process" because it "endows Amtrak with regulatory authority over its competitors." Ass'n of American Railroads v. United States Department of Transportation (American Railroads III ), 821 F.3d 19, 34 (D.C. Cir. 2016). Adhering faithfully to that holding, the district court fit the remedy to the flaw by invalidating Section 207 of the Act-the section that authorizes Amtrak to work with the Federal Railroad Administration to develop passenger-rail performance metrics and standards that, we explained, impose enforceable obligations on Amtrak's competitors. See id. at 32-34. Case closed? Apparently not. According to my colleagues, the district court ought to have discerned from this court's prior opinion that "the linchpin for Amtrak's ability to unconstitutionally exercise regulatory authority" somehow lies in a discrete, never-used statutory subsection that authorizes an independent arbitrator unaffiliated with Amtrak to take the reins if Amtrak and the Administration fail to reach agreement on the content of the metrics and standards. Majority Op. at 544. Properly read, my colleagues hold, the prior opinion ruled only that "the Due Process Clause does not allow Amtrak to use an arbitration process to impose its preferred metrics and standards on its competitors," id. at 541 (emphasis added), such that the district court could-indeed should-have responded to the ruling by invalidating only the arbitration provision. Were our prior holding that narrow, I would agree that the district court was obliged to confine its declaratory remedy to the arbitration provision. In my view, however, our prior panel held that it is Amtrak's very participation in developing the metrics and standards under the Act-and not just the possibility that Amtrak might ultimately invoke the Act's arbitration provision-that contravenes due process. I would therefore affirm the district court's order invalidating Section 207 in full.
I.
Because understanding the background of this litigation, including the terms of the 2008 Rail Act and the specific challenges leveled against its constitutionality, will *552 help readers to grasp the breadth of our prior holding, I begin with that background.
Congress enacted the 2008 Rail Act, Pub. L. No. 110-432, Div. B, 122 Stat. 4848, 4907, to address the "poor service, unreliability, and delays" that have historically dogged Amtrak's operations, Department of Transportation v. Ass'n of American Railroads (American Railroads II ), --- U.S. ----, 135 S.Ct. 1225, 1229, 191 L.Ed.2d 153 (2015). Central to this goal, Section 207 of the Act establishes, over the course of its four subsections, the regulatory regime at issue in this case. See 2008 Rail Act § 207, 122 Stat. at 4916-17 (codified at 49 U.S.C. § 24101 note). That regime's substantive core, laid out in subsection 207(a), is its requirement that Amtrak and the Department of Transportation's Federal Railroad Administration (the "Administration") "jointly ... develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations," according to criteria such as cost-effectiveness and punctuality. 2008 Rail Act § 207(a). Although these metrics and standards principally regulate Amtrak's own operations, the freight railroads that host Amtrak's trains on their privately owned tracks can be liable for damages if their failure to "provide preference to Amtrak over freight transportation" causes Amtrak to fall short of the designated standards. 49 U.S.C. § 24308(f)(2) ; see also id. § 24308(c) (establishing private carriers' obligation to give preference to Amtrak).
Section 207's remaining three subsections facilitate the creation and implementation of the jointly authored metrics and standards envisioned in subsection 207(a). Subsection 207(b) requires the Administration to produce a quarterly report on Amtrak's performance under the metrics and standards. 2008 Rail Act § 207(b). Subsection 207(c) provides that the metrics and standards must, as far as practicable, be "incorporate[d]" into Amtrak's service agreements with private track-owners. Id. § 207(c). And subsection 207(d) provides that if Amtrak and the Administration cannot agree on the content of the metrics and standards, either party may request that the Surface Transportation Board appoint an arbitrator to "assist the parties in resolving their disputes through binding arbitration." Id. § 207(d).
In 2010, Amtrak and the Administration, without resort to arbitration, developed the metrics and standards required by the Act. See Metrics and Standards for Intercity Passenger Rail Service under Section 207 of the Passenger Rail Investment and Improvement Act of 2008, 75 Fed. Reg. 26,839 (May 12, 2010). Shortly thereafter, the Association of American Railroads (the "Railroad Association") initiated this now six-and-a-half-year-old suit in federal district court. Drawing no distinctions among the Act's various subsections, the Railroad Association contended that Section 207 violates due process by "[v]esting the coercive power of the government in interested private parties," i.e. , Amtrak, and also contravenes constitutional separation-of-powers principles by "placing legislative and rulemaking authority in the hands of a private entity that participates in the very industry it is supposed to regulate." Complaint at 16-17, Ass'n of American Railroads v. Department of Transportation , 865 F.Supp.2d 22 (D.D.C. 2012). As redress, the Railroad Association sought vacatur of the metrics and standards, as well as "an order declaring that Section 207"-in its entirety-"is unconstitutional." Id. at 3.
The district court granted summary judgment to the government, and the Railroad Association appealed, renewing its argument that "Amtrak's involvement in developing the metrics and standards" violates *553 due process. Ass'n of American Railroads v. Department of Transportation (American Railroads I ), 721 F.3d 666, 677 (D.C. Cir. 2013). We had no need to address that argument, however, because we held Section 207 unconstitutional on the alternative theory that it violates separation-of-powers principles by vesting regulatory authority in a "private corporation." Id. But after the Supreme Court vacated and remanded, holding that "for purposes of determining the validity of the metrics and standards, Amtrak is a governmental entity," American Railroads II , 135 S.Ct. at 1228, we returned to the previously unresolved due-process issue.
On that issue, we held that the 2008 Rail Act "violates the Fifth Amendment's Due Process Clause by authorizing an economically self-interested actor to regulate its competitors." American Railroads III , 821 F.3d at 23. Reasoning that "the due process of law is violated when a self-interested entity is 'intrusted with the power to regulate the business ... of a competitor,' " id. at 31 (alteration in original) (quoting Carter v. Carter Coal Co. , 298 U.S. 238, 311, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) ), we asked whether "Amtrak is (1) a self-interested entity (2) with regulatory authority over its competitors," id. As long as Section 207 remains in the picture, we held, the answer is "yes." Emphasizing Amtrak's statutory duty to maximize revenues, see 49 U.S.C. § 24101(d), we concluded that Amtrak is motivated by "economic self-interest" notwithstanding its governmental character, American Railroads III , 821 F.3d at 32. And, we went on, Section 207 grants Amtrak regulatory power over its competition because it gives Amtrak "the authority to develop metrics and standards-constrained very partially ... by the [Administration] and the arbitrator," id. at 33 -and because those metrics and standards "force freight operators to alter their behavior," id. at 32.
We also separately discussed two Appointments Clause arguments the Railroad Association had added to the mix over the course of litigation. One was aimed at the makeup of Amtrak's board of directors, and the other at the Act's arbitration provision, subsection 207(d). Deeming it a "close[ ] call" as to whether the Railroad Association had properly preserved the first of these arguments, we found that "our ultimate disposition" of the case "d[id] not require us to consider it." Id. at 24. But finding the second argument "properly presented for our review," id. at 27, we held that subsection 207(d) is unconstitutional because it empowers an arbitrator neither appointed through the constitutionally requisite procedures nor overseen by an officer so appointed "to render a final decision regarding the content of the metrics and standards" in the event of a dispute between Amtrak and the Administration, id. at 37.
Five months after our mandate issued, the government moved for entry of final judgment in the district court. Under the government's proposed order, the district court would, consistent with our holding, grant summary judgment to the Railroad Association and vacate the existing metrics and standards. But there was a catch. Rather than granting the Railroad Association the full relief it had sought, including a declaration that Section 207 is unconstitutional in its entirety, the proposed order would sever subsection 207(d)-the arbitration provision-from the remainder of Section 207 and invalidate only that subsection.
The district court rejected this gambit as "stand[ing] [the panel's decision] on its head." Ass'n of American Railroads v. Department of Transportation , No. 1:11-cv-01499, 2017 WL 6209642, at *2 (D.D.C. Mar. 23, 2017). The prior panel, the district court explained, "in addressing [subsection *554 207(d) ], necessarily had the opportunity to find that the [2008 Rail Act] violated due process only insofar as it incorporated that subsection. ... That it did not do so signals that the constitutional infection spread more broadly." Id. at *3. At any rate, the district court concluded, the prior panel's foregone opportunity to announce a holding limited to subsection 207(d) "foreclose[d] [the district court] from repeating [that] inquir[y]" because "[o]n an issue the Court of Appeals duly considered, [a district court] will not propose a narrower possible holding than what it adopted." Id. Accordingly, the district court granted summary judgment to the Railroad Association, vacated the metrics and standards, and declared Section 207 unconstitutional in its entirety. See id.
II.
The government contends, and this court now agrees, that the district court committed legal error by declining to limit its declaratory remedy to subsection 207(d). I see things differently.
To begin on a point of agreement, it is well settled that the district court has "no power or authority to deviate from the mandate issued by an appellate court." Independent Petroleum Ass'n of America v. Babbitt , 235 F.3d 588, 596-97 (D.C. Cir. 2001) (quoting Briggs v. Pennsylvania Railroad Co. , 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948) ). Accordingly, the district court is foreclosed from fashioning a remedy that is "inconsistent with either the spirit or express terms of [an appellate panel's] decision." Quern v. Jordan , 440 U.S. 332, 347 n.18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). It is likewise common ground that the prior panel's judgment binds this panel no less than it bound the district court. "When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court." Crocker v. Piedmont Aviation, Inc. , 49 F.3d 735, 739 (D.C. Cir. 1995). This principle, we have observed, "encourages uniformity in the application of legal standards, enhances predictability in decisionmaking, promotes the interests of judicial efficiency and economy, and evinces respect for the efforts of earlier [panels] that have struggled to educe the appropriate legal norms." Brewster v. Commissioner , 607 F.2d 1369, 1373-74 (D.C. Cir. 1979) (per curiam).
Where my colleagues and I disagree is over the breadth of our prior panel's ruling. They believe that the prior panel held that Section 207 violates due process only insofar as it "allow[s] Amtrak to use an arbitration process to impose its preferred metrics and standards on its competitors." Majority Op. at 541 (emphasis added). Under this reading, the government's proposed remedy, which would strip the arbitration provision from the statute but otherwise leave Amtrak's joint role in developing the regulatory scheme that binds its competitors entirely intact, would indeed be "[ ]consistent with" our prior panel's decision. Quern , 440 U.S. at 347 n.18, 99 S.Ct. 1139. In my view, however, our prior panel's ruling was far broader: Section 207's due-process defect lies in the fact that it allows Amtrak "to impose its preferred metrics and standards on its competitors" at all , Majority Op. at 541, whether by prevailing in a contested arbitration proceeding or simply by convincing the Administration to adopt its proposals. So understood, our prior holding permits no remedy short of the section's wholesale invalidation.
In concluding that the 2008 Rail Act violates due process, our prior panel never suggested that the constitutional flaw resides in any localized, potentially severable portion of Section 207-and certainly never breathed so much as a hint that it *555 resides in subsection 207(d). Instead, along with Amtrak's statutory duty to "maximize its revenues," 49 U.S.C. § 24101(d), the panel cited subsection 207(a) , which tasks "Amtrak, jointly with [the Railroad Association], ... with developing the metrics and standards for passenger train operations, which directly impact freight train operations," as one of the "[t]wo undisputed features of the unique Amtrak scheme [that] set the stage for [the due-process] controversy," American Railroads III , 821 F.3d at 27. Having thus trained its focus on Amtrak's very participation in the regulatory process, the panel proceeded to confront the "specific fairness question" before it: "whether an economically self-interested entity may exercise regulatory authority over its rivals." Id. Over the course of seven pages, the panel determined, (1) "that the due process of law is violated when a self-interested entity is 'intrusted with the power to regulate the business ... of a competitor,' " id. at 31 (alteration in original) (quoting Carter Coal , 298 U.S. at 311, 56 S.Ct. 855 ), (2) that Amtrak's "economic self-interest as it concerns other market participants is undeniable," id. at 32, and (3) that Section 207 "grants Amtrak, a self-interested entity, power to regulate its competitors," id. at 34, because it "gives Amtrak the authority to develop metrics and standards-constrained very partially ... by the [Administration] and the arbitrator-that increase the risk that [the Surface Transportation Board] will initiate an investigation" that could result in a private rail carrier's liability, id. at 33. Based on these three determinations, the panel concluded that the Act "violates due process" because it "endows Amtrak with regulatory authority over its competitors." Id .
Subsection 207(d), which allows an independent arbitrator to play a regulatory role under certain circumstances, can hardly be said to "endow[ ] Amtrak with regulatory authority." Id. (emphasis added). Quite to the contrary, the panel viewed the arbitrator as a "constrain[t]" on Amtrak's regulatory power. Id. at 33. To be sure, in an alternative holding, the panel also accepted the Railroad Association's "other" argument, that Section 207's arbitration provision runs afoul of the Appointments Clause. Id. at 36. But nothing in that discussion suggests that Section 207's due-process shortcomings likewise spring from that subsection.
Three additional considerations reinforce my view that the prior panel held Section 207 so fundamentally flawed as to be incapable of judicial salvage. First, not only did the panel conspicuously decline to signal that any remedial considerations remained for the district court to address on remand, but it also declared that although its ruling did not "foreclose Congress from tapping into whatever creative spark spawned the Amtrak experiment in public-private enterprise[,] ... the Due Process Clause of the Fifth Amendment puts Congress to a choice: its chartered entities may either compete, as market participants, or regulate, as official bodies." Id. (first emphasis added). Why would the panel have described its ruling as leaving Congress a choice as to Amtrak's future role had it anticipated that the constitutional deficiency could be addressed without disturbing Section 207's essential underpinnings by simply severing subsection 207(d)? Second, had the panel meant to confine its due-process holding to that subsection, it surely would have addressed the Railroad Association's argument that Amtrak's board of directors is "constitutionally [in]eligible to exercise regulatory power." Id. at 23. Yet the panel declined to do so, concluding that the case's "ultimate disposition" obviated the need to resolve the issue. Id. at 24. This conclusion is self-explanatory if the panel believed that the Railroad Association's victory on the due-process issue entitled it to the full relief it *556 sought, but not if the panel's holding handed the Railroad Association no more than a partial win. Finally, recall that neither Amtrak nor the Administration invoked Section 207's arbitration provision in the course of developing the now-vacated 2010 metrics and standards. Accordingly, the invalidation of that provision alone would leave Amtrak and the Administration free to follow exactly the same path they previously traveled and arrive at exactly the same result. Yet readers would search our prior opinion in vain for any hint that the metrics and standards that arose out of " '[a] statute which ... undertakes an intolerable and unconstitutional interference with personal liberty and private property' and transgresses 'the very nature of' governmental function" might be so easily resuscitated. Id. at 34 (quoting Carter Coal , 298 U.S. at 311, 56 S.Ct. 855 ).
Despite the foregoing, and the fact that our prior opinion says nothing at all about subsection 207(d) over the course of its seven-page explanation as to why Section 207 "violates due process," id. at 34, this court nonetheless reads the opinion to have "identifie[d] the arbitration provision as the critical constitutional fissure." Majority Op. at 545. In support, it points out that the prior panel, after having explained the basis for its constitutional conclusion, twice cited the arbitration provision as part of its explanation as to why "[n]one of the Government's numerous counterarguments" altered that conclusion. American Railroads III , 821 F.3d at 34. These two fleeting references cannot bear the dispositive weight my colleagues assign to them.
Our prior panel first cited subsection 207(d) when rejecting the government's argument that the Administration's role in promulgating the metrics and standards "operates as an 'independent check' on Amtrak's self-interestedness." Id. at 35. The panel, however, never identified that subsection as essential to its reasoning. It wrote, and I quote in full:
To be sure, [the 2008 Rail Act] does require Amtrak and [the Administration] to "jointly" develop the metrics, but it's far from clear whether and in what way [the Administration] "checks" Amtrak. Both are subdivisions within the same branch and work in tandem to effectuate the goals Congress has set. Nowhere in the scheme is there any suggestion that [the Administration] must safeguard the freight operators' interests or constrain Amtrak's profit pursuits. Moreover , [the Administration] is powerless to overrule Amtrak. As joint developers, they occupy positions of equal authority. When there is intractable disagreement between the two, the matter is resolved by an arbitrator, who may ultimately choose to side with Amtrak. [The Administration] cannot keep Amtrak's naked self-interest in check, and therefore the requirement of joint development does not somehow sanitize the Act.
Id. (emphasis added) (footnote and citation omitted). My colleagues construe this passage as holding that, absent the arbitration provision, the 2008 Rail Act would pass constitutional muster by allowing for "the controlling intermediation of a neutral federal agency." Majority Op. at 545. But this reading leapfrogs over the panel's principal concern-reread the first three sentences-that the Administration is not a "neutral federal agency," id. , to focus exclusively on the panel's secondary rationale, hanging on by a "moreover," for holding that the Administration's involvement does not cure the Act's due-process deficiencies. Certainly, as my colleagues point out, see id. at 548, our prior panel noted that the Administration would be "presumptively disinterested" if left to develop the metrics and standards "alone ," American Railroads III , 821 F.3d at 35 *557 (emphasis added) (quoting Carter Coal , 298 U.S. at 311, 56 S.Ct. 855 ). But the panel doubted the Administration's ability to remain impartial under the actual joint scheme at issue here, given that Section 207 requires the Administration to "work in tandem" with a self-interested "subdivision[ ] within the same branch" to regulate parties whose interests neither regulator has any incentive to "safeguard." Id.
The panel's second (and final) reference to subsection 207(d) in the due-process context appears in a footnote distinguishing a line of cases, including Currin v. Wallace , 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939), and Sunshine Anthracite Coal Co. v. Adkins , 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940), in which "the [Supreme] Court has upheld arrangements under which regulatory burdens can be imposed by the joint action of a self-interested group and a government agency." American Railroads III , 821 F.3d at 34 n.4. The panel believed that these cases were "inapplicable" to Amtrak's position "because [the Administration's] authority to hold the line against overreaching by Amtrak is undermined by the power of the arbitrator." Id. But the mere fact that the panel found subsection 207(d) sufficient to distinguish the statutory scheme at issue here from those upheld in Currin and Adkins hardly suggests that, under the panel's theory of unconstitutionality, those cases would govern but for that subsection. Indeed, prior to this case's run up to the Supreme Court, that same panel in an earlier opinion found that Section 207 bore only "a passing resemblance to the humbler statutory frameworks in [ Currin ] and [ Adkins ]" and went on to distinguish those cases on grounds entirely unrelated to the arbitration provision. American Railroads I , 721 F.3d at 671 ; see also id. (noting that "[t]he industries in Currin ," unlike Amtrak, "did not craft [industry] regulations" but merely had the opportunity to vote on whether to approve agency-written regulations, and that "the agency in Adkins could unilaterally change regulations proposed to it by private parties, whereas" under the Act, "Amtrak enjoys authority equal to" the Administration's). The ready availability of alternate grounds for distinguishing Currin and Adkins strongly counsels against reading the panel's cursory, footnoted treatment of these cases to suggest that the due-process violation we held to inhere in Amtrak's "coercive regulatory power" under the Act, American Railroads III , 821 F.3d at 34, could somehow be cured by removing an independent "constrain[t]" on that power, id. at 33.
The broader point is this: these two references to subsection 207(d) nowhere suggest that removing the arbitrator as the final decision-maker, and thereby effectively allowing the Administration to veto Amtrak's regulatory proposals, would render Section 207 constitutional. Even accepting, as do my colleagues, that these references can be read together to establish our prior panel's acknowledgment that the Constitution would not "prohibit Amtrak from exercising some measure of joint control with a disinterested governmental agency, as long as that agency's duty to protect the 'public good' could check Amtrak's self-interest," Majority Op. at 545 (quoting American Railroads III , 821 F.3d at 29 ), we cannot ignore the panel's express determination that the Administration is neither disinterested nor tasked with "constrain[ing] Amtrak's profit pursuits," American Railroads III , 821 F.3d at 35, or acting as "a steward for the interests of freight operators" that are bound by the Amtrak-influenced metrics and standards, id. at 35 n.5. The "government's increasing reliance on public-private partnerships," the panel explained, "portends an ... ill-fitting accommodation between the exercise of regulatory power and concerns about fairness and accountability." Id. at 31. Even if, as my colleagues *558 see it, subsection 207(d) "empowered Amtrak to impose on its competitors rules formulated with its own self-interest in mind" because "[a]ll Amtrak had to do was persuade the arbitrator to rule in its favor," Majority Op. at 545, removing that subsection would do nothing to satisfy our prior panel's concern that Amtrak could easily persuade the Administration to accede to its self-interested demands. After all, the Administration, more so than an independent arbitrator, lacks any structural incentive to stand up to Amtrak, a "subdivision[ ] within the same branch." American Railroads III , 821 F.3d at 35.
To the contrary, and for the reasons I have already given, removing subsection 207(d) would not correct the due-process deficiencies our prior panel perceived in Section 207. Put simply, the panel held that Section 207 violates due process because it allows "a self-interested entity" to exercise "regulatory authority over its competitors." American Railroads III , 821 F.3d at 31. The panel nowhere indicated that the arbitration provision renders Amtrak any more self-interested than it otherwise would be, and, far from viewing that provision as effectuating Amtrak's regulatory authority, the panel described the provision as a "constrain[t]" on that authority. Id. at 33. To be sure, as my colleagues point out, the prior panel, in so characterizing the arbitration provision, referenced its later "discuss[ion]" of Currin and Adkins . Majority Op. at 547 (quoting American Railroads III , 821 F.3d at 33 ). But nothing in that discussion says that the statutory subsection that "constrain[s]" Amtrak's regulatory authority is, paradoxically, the very source of that authority. American Railroads III , 821 F.3d at 33.
In my view, then, the district court correctly concluded that the government's proposed remedy would not address the 2008 Rail Act's constitutional flaws as the prior panel explained them. My colleagues are able to arrive at the opposite conclusion only by imputing to our prior panel a far narrower theory of Section 207's unconstitutionality than it ever endorsed or even suggested.
III.
The court today emphasizes the "grav[ity]" of invalidating a duly enacted statute and our duty as the judiciary to do as little damage as possible to the work of the elected branches of government. Majority Op. at 544. "[W]hen a constitutional question must be joined," my colleagues observe, "courts must choose the narrowest constitutional path to decision."Id . But these important concerns, which I share, also bound our prior panel. See El Paso & Northeastern Railway Co. v. Gutierrez , 215 U.S. 87, 96, 30 S.Ct. 21, 54 L.Ed. 106 (1909) ("[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of [a] court to so declare ...." (emphasis added) ). Out of "respect for [its] efforts," Brewster , 607 F.2d at 1373, I would presume that our prior panel well heeded its obligation to "act cautiously" when "review[ing] the constitutionality of a legislative Act," Regan v. Time, Inc. , 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion), and that its decision not to confine its due-process holding to any single statutory subsection reflects its considered judgment that Section 207's constitutional flaws are fatal to the whole.
If the government disagrees with this assumption and believes that our prior panel simply neglected its obligation to consider whether it could dispose of the Railroad Association's due-process challenge on narrower grounds, then it should have said as much in its petition for rehearing en banc. After all, if a panel that *559 holds an Act of Congress unconstitutional fails to consider whether it can cast its holding more narrowly, it commits an error that may well justify en banc review. See generally D.C. Cir. R. 35(a) (allowing for en banc review where a matter "involves a question of exceptional importance"). But in its en banc petition, the government did not argue that the panel should have considered a more targeted constitutional holding-say, for example, the one this court adopts today. Had it done so, I might well have voted to rehear the case en banc. But that argument having never been made and rehearing en banc having been denied, we are now bound by that panel's holding-whatever we think of it. See, e.g. , United States v. Kolter , 71 F.3d 425, 431 (D.C. Cir. 1995) ("This panel would be bound by [a prior panel's] decision even if we did not agree with it."); Ass'n of Civilian Technicians, Montana Air Chapter v. FLRA , 756 F.2d 172, 176 (D.C. Cir. 1985) (stare decisis principles "would be undermined if previous decisions were open to reconsideration merely because they were debatable").
Once our prior panel's opinion became final, the "legal donnybrook over the bounds of congressional power" that this case once posed came to an end. Majority Op. at 541. The only task that remained for the district court was to enter relief that honored this court's binding resolution of the legal issues in play. Because I believe the district court fulfilled its obligation, giving our prior panel's opinion its most natural reading, I respectfully dissent.