# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 10, 2015          Decided April 29, 2016

No. 12-5204

ASSOCIATION OF AMERICAN RAILROADS,
APPELLANT

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL.,
APPELLEES

———

On Remand from the
Supreme Court of the United States

———

*Thomas H. Dupree Jr.* argued the cause for appellant. With him on the briefs were *Amir C. Tayrani*, *Lucas C. Townsend*, and *Louis P. Warchot.*

*David B. Rivin*, *Jr.*, *Andrew M. Grossman*, *Shannen W. Coffin*, and *Michael J. Edney* were on the brief for *amici curiae* Chamber of Commerce of the United States, et al. in support of appellant.

*Richard B. Katskee* and *Craig W. Canetti* were on the brief for *amicus curiae* Association of Independent Passenger Rail Operators in support of appellant. *Dan Himmelfarb* entered an appearance.

*Christopher J. Paolella* was on the brief for *amicus curiae* Professor Alexander Volokh in support of plaintiff-appellant.

*Michael S. Raab*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent H. Cohen*, *Jr*., Acting U.S. Attorney, and *Mark B. Stern*, *Daniel Tenny*, *Patrick G. Nemeroff*, Attorneys, *Paul M. Geier*, Assistant General Counsel for Litigation, U.S. Department of Transportation, *Peter J. Plocki*, Deputy Assistant General Counsel for Litigation, and *Joy Park*, Attorney.

Before: BROWN, *Circuit Judge* and WILLIAMS and SENTELLE, *Senior Circuit Judges.*

Opinion of the Court by *Circuit Judge* BROWN:

BROWN, *Circuit Judge*: With the Rail Passenger Service Act of 1970, Congress created Amtrak, a for-profit corporation indirectly controlled by the President of the United States. This public venture into private enterprise was, and remains, unprecedented. With the Passenger Rail Investment and Improvement Act of 2008 (PRIIA), Congress piled anomaly on top of anomaly. *See* 122 Stat. 4907. It endowed this wholly unique statutory creature with agency powers, authorizing it to regulate its resource competitors. *See* PRIIA § 207(a). It further permitted, under certain conditions, an arbitrator of unspecified constitutional authority to issue binding final agency rulings. *Id.* § 207(d).

The first time this case was before us, we invalidated PRIIA as an unconstitutional delegation of regulatory power to what we believed was a private entity. *Ass'n of Am. R.R. v.*

*Dep't of Transp.*, 721 F.3d 666, 677 (D.C. Cir. 2013). The Supreme Court reversed. *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225 (2015). It held that Amtrak's designation and operation as a for-profit corporation doesn't mean we can't *also* consider it a governmental entity. *Id.* at 1232–34.

For the freight operators who challenged PRIIA, however, that decision left three questions unanswered. Conceding Amtrak's governmental status, the operators—represented by the Association of American Railroads—ask: Does it violate due process for an entity to make law when, economically speaking, it has skin in the game? Does it violate the Appointments Clause for Congress to vest appointment power of a principal officer in the Surface Transportation Board? And is a government corporation whose board is only partially comprised of members appointed by the President constitutionally eligible to exercise regulatory power? We decline to reach the latter question, but we side with the freight operators on the former two. We conclude PRIIA violates the Fifth Amendment's Due Process Clause by authorizing an economically self-interested actor to regulate its competitors[1] and violates the Appointments Clause for delegating regulatory power to an improperly appointed arbitrator.

I

Since this controversy's factual and legal backdrop has been ably set forth now on two occasions, once in our prior opinion and again in the Supreme Court's, we needn't spill

---

[1] Amtrak and freight railroads do not compete for passengers but do compete for scarce resources (i.e. train track) essential to the operation of both kinds of rail service.

much more ink repeating what's already been said. However, some recitation of the pertinent statutory scheme is necessary, as well as a brief update on the procedural history of this case.

Section 207 of PRIIA tasks Amtrak and the Federal Railroad Administration (FRA) with jointly developing performance metrics and standards as a means of enforcing Amtrak's statutory priority over other trains. *See* PRIIA § 207(a). These standards are intended to measure the "performance and service quality of intercity passenger train operations, including cost recovery, on-time performance and minutes of delay, ridership, on-board services, stations, facilities, equipment, and other services." *Id.* In the event Amtrak and FRA can't agree on the composition of these "metrics and standards," either "may petition the Surface Transportation Board to appoint an arbitrator to assist the parties in resolving their disputes through binding arbitration." *Id.* § 207(d). Once these metrics and standards have been finalized, Amtrak and its host rail carriers "shall incorporate" them into their operating agreements "[t]o the extent practicable." *Id.* § 207(c).

In our prior ruling, we determined PRIIA constituted an unconstitutional delegation of legislative authority to a private entity. *See Ass'n of Am. R.R.*, 721 F.3d at 677. In our view, "[t]hough the federal government's involvement in Amtrak is considerable," the fact that "Congress has both designated it a private corporation and instructed that it be managed so as to maximize profit" disqualified it from exercising regulatory power. *Id.* The Supreme Court reversed. *See Dep't of Transp.*, 135 S. Ct. at 1228. Relying on *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), the Court concluded "Amtrak is a governmental entity, not a private one, for purposes of determining the constitutional issues presented in this case." *Dep't of Transp.*, 135 S. Ct. at 1233. The Court

remanded the case for us to consider the freight operators' remaining challenges to the constitutionality of PRIIA "to the extent they are properly before" us. *Id.* at 1234.

Here on remand, the freight operators advance the three challenges to PRIIA described above. Because these claims are still before us pursuant to the district court's summary judgment ruling, our review is de novo. *See Edwards v. District of Columbia*, 755 F.3d 996, 1000 (D.C. Cir. 2014).

II

Before we reach the merits of the freight operators' challenge, we first pause to consider whether their claims are properly preserved. Our responsibility as an appellate court is to *review* the decisions of lower tribunals, and "[t]he very word 'review' presupposes that a litigant's arguments have been raised and considered in the tribunal of first instance." *Freytag v. C.I.R.*, 501 U.S. 868, 895 (1991). Where a claim was not properly preserved below, our authority to decide it on appeal is "strictly circumscribed." *Puckett v. United States*, 556 U.S. 129, 134 (2009).

Given the unique procedural history of this case, preservation questions attach to each of the freight operators' three claims. We conclude the due process claim was properly preserved, and the arbitration clause claim is properly before us due to the government's waiver, the detailed merits briefing, and the purely legal and potentially jurisdictional nature of the issue. The freight operators' board of directors argument is a much closer call, but because our ultimate disposition in this case does not require us to consider it, we offer no opinion here as to whether it was properly preserved.

6

A

In its summary judgment, the district court declined to reach the freight operators' due process argument because it was, in the court's view, "outside the scope of [the] Complaint" and not "raised in [the freight operators'] initial brief." 865 F. Supp. 2d 22, 31 (D.D.C. 2012). We disagree. The freight operators raised the argument they now advance on appeal at every stage of this litigation—in their complaint and in each brief, from summary judgment to their prior appeal before this panel to their appeal to the Supreme Court.

The district court's opposite conclusion derives from a misreading of the complaint. The freight operators asserted two claims. AAR Compl. 16–17. The first was unconstitutional nondelegation to a private entity, the sole issue addressed in our prior opinion. *Id.* at 16. The second, though, was due process. Specifically, the freight operators alleged, at paragraphs 53 and 54 under a heading titled "Violation of the United States Constitution (Due Process)," PRIIA is unconstitutional because it (1) vests rulemaking authority in the hands of interested private parties, and (2) empowers Amtrak with power to enhance its commercial position relative to other market participants. *Id.* at 16–17.

The district court did not overlook the due process claim entirely, but did fail to notice the freight operators' complaint made not one, but two due process arguments. The court rejected the freight operators argument because their complaint's due process claim was "premised on Amtrak's status as a private entity." 865 F. Supp. 2d at 29. However, that is only half-true. Paragraph 53 of the complaint alleged the PRIIA "violates the due process rights of regulated third parties" by "[v]esting the coercive power of the government in interested private parties." AAR Compl. At 17. Then,

paragraph 54 outlined a separate due process theory, one premised on Amtrak's status as a *government* entity operating as a market participant. It alleged PRIIA also "violates the due process rights of the freight railroads because it purports to empower Amtrak to wield legislative and rulemaking power to enhance its commercial position at the expense of other industry participants." *Id.* The freight operators' due process claim thus can only be seen as premised solely on Amtrak's status as a private entity by reading paragraph 54 as redundant of 53, a view we do not share, especially considering our well-established practice of "constru[ing] the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).

Our reading of the freight operators' complaint is corroborated by their summary judgment briefing, which attacks PRIIA's constitutionality "even if Amtrak were somehow deemed a government agency." District Court ECF No. 12 at 15–16. In two cogent, detailed paragraphs, the freight operators made their case, explaining why Amtrak's wielding of regulatory authority as a market participant violated due process and belying the district court's view of the argument as "raised only cursorily." 865 F. Supp. 2d at 32. To be sure, the freight operators could have made a more robust due process argument, as they did in their briefing here on appeal. But what they did below was enough to preserve the issue for our review.

B

The freight operators failed to preserve their arbitration clause claim. They never so much as hinted at this argument until their first brief filed in our court. That said, several

considerations convince us that deciding the arbitration claim is an appropriate exercise of our appellate authority.

First, and most important, the government never argued the arbitration claim was not properly preserved. Instead, the government devoted more than eight pages of its brief to the merits of the claim without mentioning preservation.[2] This objection is waivable and the government seems to have waived any waiver argument. *See United States v. Layeni*, 90 F.3d 514, 522 (D.C. Cir. 1996) ("Arguments not raised in the district court are generally deemed waived on appeal . . . . The government, however, has waived the waiver argument by not raising it."); *United States v. Quiroz*, 22 F.3d 489, 490–91 (2d Cir. 1994) ("[W]hen [the government] has neglected to argue on appeal that a defendant has failed to preserve a given argument . . . courts have consistently held that the government has 'waived waiver.'"); *Erhart v. Sec. of Health & Human Servs.*, 969 F.2d 534, 537 (7th Cir. 1992) (addressing an unpreserved argument because "the government did not object, so it has waived waver").

Second, as mentioned above, the government thoroughly briefed the claim. This is not, then, a case in which "the opposing party los[t] its opportunity to contest the merits" nor does it risk "an improvident or ill-advised opinion on the legal issues tendered." *Se. Mich. Gas Co. v. FERC*, 133 F.3d 34, 42 n.3 (D.C. Cir. 1998).

Third, the arbitration claim is an abstract legal question, one that does not turn on facts that would have been

---

[2] The only language that comes close is the government's reference to the "never-invoked arbitration provision." Gov. Br. 40. But this has nothing to do with preservation. The government is merely noting that the parties settled their dispute and thus never entered (or "invoked") arbitration.

developed in district court. In our previous opinion, we discussed the question at some length, *see AAR*, 721 F.3d at 673–74, as did Justice Alito in his concurring opinion, *Dep't of Transp.*, 135 S.Ct. at 1235–39. Deciding fully briefed, purely legal questions is a quotidian undertaking for an appellate court.

Fourth, the Supreme Court has treated certain objections premised on a violation of the Appointments Clause as "nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Freytag*, 501 U.S. at 878–79; *see also Glidden Co. v. Zdanok*, 370 U.S. 530, 535–36 (1962) (reaching challenge even though not raised below because "[t]he alleged defect of authority here relates to basic constitutional objections designed in part for the benefit of the litigants"); *Lamar v. United States*, 241 U.S. 103, 117–18 (1916) (deciding an appointments power claim despite the fact that it had not been raised below or even in the Supreme Court until the filing of a supplemental brief upon a second request for review).

Perhaps none of these considerations would be sufficient on their own to justify our review of an unpreserved claim. *Cf. Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 388 F.3d 337, 344 (D.C. Cir. 2004) (reaching an argument because appellants both "consistently raised the claim" *and* "appellees do not purport to have argued . . . the claim was waived"). But taken together, the government's failure to object, the extensive briefing, the purely legal character of the freight operators' arbitration claim, and the significant structural constitutional rights at stake convince us that reaching it is an appropriate exercise of our appellate authority. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on

appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.").

Accordingly, we conclude the freight operators' due process claim and arbitration claim are both properly presented for our review.

III

No clause in our nation's Constitution has as ancient a pedigree as the guarantee that "[n]o person . . . shall be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. V. Its lineage reaches back to 1215 A.D.'s Magna Carta, which ensured that "[n]o freeman shall be . . . disseised of his . . . liberties, or . . . otherwise destroyed . . . but by lawful judgment of his peers, or by the law of the land." Magna Carta, ch. 29, *in* 1 E. Coke, The Second Part of the Institutes of the Laws of England 45 (1797). Since the Fifth Amendment's ratification, one theme above all others has dominated the Supreme Court's interpretation of the Due Process Clause: fairness. *See Snyder v. Com. of Mass.*, 291 U.S. 97, 116 (1934) (Cardozo, J.) ("Due process of law requires that the proceedings shall be fair, but fairness is a relative, not an absolute, concept. It is fairness with reference to particular conditions or particular results.").

The specific fairness question we face here is whether an economically self-interested entity may exercise regulatory authority over its rivals. Two undisputed features of the unique Amtrak scheme set the stage for this controversy. First, Amtrak is operated "as a for-profit corporation" charged with "undertak[ing] initiatives . . . designed to maximize its revenues." 49 U.S.C. § 24301(a)(2); *id.* § 24101(d). Second, Amtrak, jointly with FRA, is tasked with developing the

metrics and standards for passenger train operations, which directly impact freight train operations. *See* PRIIA § 207(a). The freight operators perceive a due process defect in this scheme. They argue an economically self-interested actor may not exercise regulatory power, and yet here, Amtrak is a self-interested market participant wielding regulatory power. The Government denies Amtrak's self-interest is constitutionally relevant and avers the established procedures accord all the process freight operators are due.

We agree with the freight operators. Our view of this case can be reduced to a neat syllogism: if giving a self-interested entity regulatory authority over its competitors violates due process (major premise); and PRIIA gives a self-interested entity regulatory authority over its competitors (minor premise); then PRIIA violates due process.

A

The abstract legal question at the heart of this case is whether it violates due process for Congress to give a self-interested entity rulemaking authority over its competitors. The Supreme Court has confronted the question only once. *See Carter v. Carter Coal Co.*, 298 U.S 238 (1936). The *Carter Coal* Court invalidated a delegation that empowered one set of competitors to regulate a rival set. *Id.* at 311–12. That decision predates the Administrative Procedure Act and the birth of the Court's modern administrative law jurisprudence. But aside from *Carter Coal*, the only other case to comment on the propriety of rulemaking bias is our circuit's *Association of National Advertisers, Inc. v. FTC (ANA)*, and it cut the other direction, sanctioning the bias.

627 F.2d 1151 (D.C. Cir. 1979).[3] That decision, however, dealt with a different kind of bias than in *Carter Coal*; it involved prejudgment rather than financial bias. *See id.* at 1154. Thus, all we have as our guide are two imperfect precedents, and unsurprisingly, the freight operators rely on *Carter Coal*, while the Government relies on *Association of National Advertisers*.

The freight operators' case of choice, *Carter Coal*, involved a challenge to the Bituminous Coal Conservation Act, which *inter alia* prohibited the United States or any other contractor from purchasing bituminous coal from any mine that did not comply with certain wage and hour requirements. But the Act itself did not articulate those requirements. *See* 298 U.S at 310. It delegated the authority to determine them to "the producers of more than two-thirds of the . . . tonnage production for the preceding calendar year" and "more than

---

[3] Freight operators invite us to reject the delegation to Amtrak based on cases like *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), in which "rigid requirements" of impartiality were applied to invalidate official action tainted by bias. *See also Tumey v. Ohio*, 273 U.S. 510 (1927) (finding a due process violation where the mayor, sitting as judge over a criminal trial, retained whatever fines he imposed); *Ward v. Village of Monroeville*, 409 U.S. 57 (1972) (extending *Tumey* to a more remote incentive, when the town's budget, controlled by the mayor, depended on fines imposed by the mayor's court); *Gibson v. Berryhill*, 411 U.S. 564 (1973) (finding a due process violation where a Board of Optometry's "efforts would possibly redound to the personal benefit of members of the Board"). These cases, however, involved officials acting in an *adjudicatory* capacity, where due process demands are stricter and courts enforce them with a heavy appellate touch. But our appellate touch is far lighter when bias presents in the rulemaking context. *See ANA*, 627 F.2d at 1168–69. For this reason, we do not rely on these adjudicatory cases.

one-half the mine workers employed." *Id.* Put simply, the Act endowed these majority producers and employers with the authority to set wage and hour requirements the minority producers and employers had to comply with or else forfeit all their customers.

In the Court's view, for the minority producers "[t]o 'accept,' in these circumstances [was] not to exercise a choice, but to surrender to force." *Id.* at 311. The provision "subject[ed] the dissentient minority . . . to the will of the stated majority," and conferred on that majority "the power to regulate the affairs of [the] unwilling minority." *Id.* Disapproving the scheme, the Court reasoned:

> This is legislative delegation in its most obnoxious form; for it is not even delegation *to an official or an official body, presumptively disinterested, but to private persons* whose interests may be and often are adverse to the interests of others in the same business.

*Id.* (emphasis added). At first blush, it's not clear precisely which aspect of the delegation offended the Court. By one reading, it was the Act's delegation to "private persons" rather than official bodies. By another, it was the delegation to persons "whose interests may be and often are adverse to the interests of others in the same business" rather than persons who are "presumptively disinterested," as official bodies tend to be. Of course, the Court also may have been offended on both fronts. But as the opinion continues, it becomes clear that what *primarily* drives the Court to strike down this provision is the self-interested character of the delegatees':

> The difference between producing coal and regulating its production is, of course, fundamental.

> The former is a private activity; the latter is necessarily a governmental function, since, *in the very nature of things*, one person may not be intrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property.

*Id.* (emphasis added). The power to self-interestedly regulate the business of a competitor is, according to *Carter Coal*, anathema to "the very nature of things," or rather, to the very nature of governmental function. Delegating legislative authority to official bodies is inoffensive because we presume those bodies are *disinterested*, that their loyalties lie with the public good, not their private gain. But here, the majority producers "may be and often are adverse to the interests of others in the same business." *Id.* That naked self-interest compromised their neutrality and worked "an intolerable and unconstitutional interference with personal liberty and private property." *Id.* Accordingly, the Court invalidated the Act as "so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment." *Id*.

The Government's case of choice, *Association of National Advertisers*, manifests a higher tolerance for administrative bias than the Court's in *Carter Coal.* It involved a different kind of rulemaking bias: prejudgment. An FTC commissioner, speaking at a public conference, unequivocally expressed his desire for limitations on TV advertisements targeted at children. Soon thereafter, the FTC proposed a rule to precisely that end. The Association of National Advertisers petitioned to set the rule aside because, in their view, the commissioner had prejudged the outcome

and his participation in the rulemaking violated the Due Process Clause. *See ANA*, 627 F.2d at 1169–70.

The Association built its argument around this court's disqualification test in *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970), which asked "whether a disinterested observer may conclude that (the agency) has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Id.* at 591 (alterations omitted). But the court declined to apply the *Cinderella* test to rulemaking procedures and upheld the FTC's action under a standard far more tolerant of bias. *ANA*, 627 F.2d at 1168–69. Effective exercise of legislative or quasi-legislative authority demands the official "engage in debate and discussion about the policy matters before him." *Id.* at 1169; *see also Home Box Office, Inc. v. FCC*, 567 F.2d 9, 57 (D.C. Cir. 1977) (per curiam) ("[I]nformal contacts between agencies and the public are the bread and butter of the process of administration . . . ."). Analogizing to Congress, the court observed that "any suggestion that congressmen may not prejudge factual and policy issues is fanciful. A legislator must have the ability to exchange views with constituents and to suggest public policy that is dependent upon factual assumptions." *ANA*, 627 F.2d at 1165.

But the court stopped short of declaring rulemakers could never be disqualified for prejudgment. The panel decided instead that "clear and convincing" evidence (or, later, "the most compelling proof") that an "agency member has an unalterably closed mind on matters critical to the disposition of the proceeding" would suffice to disqualify a decisionmaker. *Id.* at 1170, 1175. "There is no doubt," the court acknowledged, "that the purpose of [a rulemaking proceeding] would be frustrated if a Commission member had reached an irrevocable decision on whether a rule should be

issued prior to the Commission's final action." *Id.* at 1170. Under this new test, the court found the evidence insufficient to disqualify the FTC Commissioner. *Id.* at 1174–75.

What is most instructive about *Association of National Advertisers* is not its holding, which is not directly controlling here, but rather its theory about permissible bias. Ultimately, it came down to the court's concern over the propriety of judicial interference in policy debates. Applying the usual standard of a "neutral and detached adjudicator" to the rulemaking context "would plunge courts into the midst of political battles concerning the proper formulation of administrative policy." *Id.* at 1174. The court observed, "[w]e serve as guarantors of statutory and constitutional rights, but not as arbiters of the political process." *Id.* at 1174–75. If the FTC Commissioner's strident views on advertisements targeted at children troubled the public, the proper recourse was at the polls, not the courts. This view is perhaps what motivated the district court to opine, in its denial of the freight operators' summary judgment motion, the "potential for bias appears remote" on account of "Amtrak's political accountability." *AAR*, 865 F. Supp. 2d at 32.

To conclude that Amtrak's political accountability—remote as it is—removes the taint of any potential for bias would be a simple way to resolve this case. After all, legislators may legislate in pursuit of their own naked self-interest. Congress had to pass the STOCK Act just to put a stop to congressional insider trading. *See* Tamara Keith, *How Congress Quietly Overhauled Its Insider-Trading Law*, NPR, http://www.npr.org/sections/itsallpolitics/2013/04/16/1774967 34. Those whose rights may be trammeled by legislators brazen enough to pursue their own economic self-interest "are protected in the only way that they can be in a complex

society, by their power, immediate or remote, over those who make the rule." *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (Holmes, J.). In fact, our Constitution's ingenious system of checks and balances *assumes* government officials will act self-interestedly. "Happy will it be if our choice should be directed by a judicious estimate of our true interests, unperplexed and unbiased by considerations not connected with the public good," the very first installment of the *Federalist Papers* opined. The Federalist No. 1, at 33 (C. Rossiter ed., 1961) (Hamilton). "But it is a thing more ardently to be wished than seriously to be expected." *Id.* And as Alexander Hamilton observed elsewhere: "We may preach till we are tired of the theme, the necessity of disinterestedness in republics, without making a single proselyte." Alexander Hamilton, *The Continentalist No. IV*, in 3 *The Papers of Alexander Hamilton* 99, 103 (Harold C. Syrett ed., 1962). Self-interested lawmaking was not some shocking aberration; it was an unwelcomed expectation, one our Constitution endeavored to channel and check. *See* The Federalist No. 51, at 321–22 (Madison) (C. Rossiter ed., 1961) ("Ambition must be made to counteract ambition.").

However, despite acknowledging that "[a] dependence on the people is, no doubt, the primary control on the government," *id.* at 322, the Framers never expected political accountability would be sufficient on its own to check self-interest. *Id.* "[E]xperience has taught mankind the necessity of auxiliary precautions." *Id.* So the Framers fashioned devices that would "supply[], by opposite and rival interests, the defect of better motives." *Id.* But of one thing we may be sure, these "auxiliary precautions" against "ambition" that were built into our Constitution—bicameralism, presentment, judicial independence and life tenure, etc.—were designed for a government of three branches, not four. The Framers

"could not have anticipated the vast growth of the administrative state," which "with its reams of regulations would leave them rubbing their eyes." *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 755 (2002). Those original checks on self-interest, custom-fitted for legislators, presidents, and judges, loosely drape administrators like outsized hand-me-downs.

Indeed, government's increasing reliance on public-private partnerships portends an even more ill-fitting accommodation between the exercise of regulatory power and concerns about fairness and accountability. Curbing the misuse of public power was the aim of the Magna Carta, and the Supreme Court has consistently concluded the delegation of coercive power to private parties can raise similar due process concerns. *See Eubank v. City of Richmond,* 226 U.S. 137 (1912); *City of Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 677–78 (1976); *see also Silverman v. Barry,* 727 F.2d 1121, 1126 (D.C. Cir. 1984). Wherever Amtrak may fall along the spectrum between public accountability and private self-interest, the ability—if it exists—to co-opt the state's coercive power to impose a disadvantageous regulatory regime on its market competitors would be problematic. *See, e.g.,* Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges,* 37 Harv. J. L. & Pub. Pol'y 931 (2004).

For these reasons, *Carter Coal*, not *Association of National Advertisers*, dictates our answer to this constitutional conundrum. We conclude, as did the Supreme Court in 1936, that the due process of law is violated when a self-interested entity is "intrusted with the power to regulate the business . . . of a competitor." *Carter Coal*, 298 U.S. at 311. "[A] statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal

liberty and private property" and transgresses "the very nature of [governmental function]." *Id.*

B

We next consider the minor premise of our syllogism. PRIIA only violates due process if Amtrak is (1) a self-interested entity (2) with regulatory authority over its competitors.

1

In its opinion reversing our prior judgment, the Supreme Court did not decide whether Amtrak is a self-interested entity. Affirming Amtrak's status as a governmental entity, the Court highlighted how Amtrak's operations are directed by and dependent on the federal government. It noted that "rather than advancing its own private economic interests, Amtrak is required to pursue numerous, additional goals defined by statute" including "provid[ing] efficient and effective intercity passenger rail mobility," "minimiz[ing] Government subsidies," "provid[ing] reduced fares to the disabled and elderly," and "ensur[ing] mobility in times of national disaster." *Dep't of Transp.*, 135 S. Ct. at 1232. Moreover, "certain aspects of Amtrak's day-to-day operations" are dictated by congressional directive. *Id.* For example, Amtrak is required to "maintain a route between Louisiana and Florida" and to purchase materials "mined or produced in the United States." *Id.* Finally, Amtrak is "dependent on federal financial support" to the tune of more than "$1 billion annually." *Id.* "Given the combination of these unique features and its significant ties to the Government," the Court concluded, "Amtrak is not an autonomous private enterprise." *Id.*

We are bound by the Court's conclusion, and we do not disagree with it. Amtrak is clearly dependent on the government in ways other for-profit corporations are not. But concluding "Amtrak is not an autonomous private enterprise" is not the same as concluding it is not economically self-interested. Though a government entity, Amtrak is still statutorily obligated to "be operated and managed as a for-profit corporation." 49 U.S.C. § 24301(a)(2). Consistent with that obligation, Amtrak is "to make agreements with the private sector and undertake initiatives that are consistent with good business judgment and designed to maximize its revenues and minimize Government subsidies." *Id.* § 24101(d). Moreover, Congress built financial incentives into its scheme to coax its profit-maximizing efforts, allowing Amtrak's officers to receive pay greater than "the general level of pay for officers of rail carriers with comparable responsibility" for any year in which Amtrak does not receive federal assistance. *Id.* § 24303(b). Amtrak's lack of full autonomy does nothing to relieve it of its statutory charge to maximize company profits.

The Government relies on Amtrak's obligation to fulfill numerous other statutory goals for the public good as evidence that it is not economically self-interested. But many corporations are obligated to compromise profit-seeking ambitions pursuant to statutory goals aimed at public goods. Corporations must, for instance, comply with the Americans with Disabilities Act, the Clean Air Act, and the Affordable Care Act, even though doing so may not otherwise have been the most economically prudent choice. Compliance with these statutory directives does not somehow negate economic self-interest. Neither does Amtrak's compliance with its statutory directives negate its concrete economic self-interest. The Government identifies no way in which Amtrak's special obligations in any way obstruct it from the pure pursuit of

profit in the standard-setting exercise that is before us.

Amtrak's self-interest is readily apparent when viewed, by contrast, alongside more traditional governmental entities that are decidedly not self-interested. The government of the United States is not a business that aims to increase its bottom line to achieve maximum profitability. Unlike for-profit corporations, government strives—at least in theory—for an equilibrium of revenues and expenditures, where the revenue obtained is no more and no less than the operating costs of the services provided. Amtrak's charter stands in stark contrast. Its economic self-interest as it concerns other market participants is undeniable.

2

We next consider whether Amtrak has power to regulate its competitors. Another way to put this question is whether the "metrics and standards" force freight operators to alter their behavior. According to the Government, PRIIA merely allows Amtrak "to participate in the development of metrics and standards for assessing its own performance." Gov. Br. 30. And it further asserts that any effect those metrics and standards have on freight operators is due either (1) to the operators' own voluntary consent to "incorporate" the metrics into their operating agreements or (2) to their violation of the statutory preference they agreed to back in 1970.

As to the first, the Government suggests the bargaining positions of Amtrak and the host rail carriers are no different than those enjoyed by ordinary market entities negotiating at arm's length. PRIIA only requires freight operators "incorporate the metrics and standards" into their agreements "to the extent practicable." PRIIA § 207(c). And to the extent it is impractical and an agreement between Amtrak and

a host rail carrier cannot be reached, the Surface Transportation Board (STB) will "prescribe reasonable terms and compensation." 49 U.S.C. § 24308(a)(2)(A)(ii). But ordinarily, one party doesn't face statutory pressure to acquiesce in the other's demands "to the extent practicable." That "the railroads may avoid incorporating the metrics and standards by arguing that incorporation is impracticable" doesn't render the scheme nonregulatory—"they [still] have a legal duty to try." *Dep't of Transp.*, 135 S. Ct. at 1253 (Thomas, J., concurring in the judgment). And since the pressure to accept Amtrak's demands might have force when the STB "prescribe[s] reasonable terms and compensation" in cases where Amtrak and a carrier cannot reach agreement, *see* 49 U.S.C. § 24308(a)(2)(A)(ii), carriers may face a heightened risk of disadvantageous terms or rates as a result of metrics and standards developed in part by Amtrak.

And as to the second, the Government attempts to downplay the enforcement effects of these metrics and standards on freight operators. PRIIA permits the STB to "initiate an investigation" whenever Amtrak's on-time performance "averages less than 80 percent for any 2 consecutive calendar quarters," regardless whether the metrics and standards were incorporated into the operating agreements of any affected freight operators. *See* PRIIA § 213(a), *id.* § 24308(f)(1). PRIIA also triggers STB investigation where the "service quality of intercity passenger train operations for which minimum standards are established under section 207 . . . fails to meet those standards for 2 consecutive calendar quarters." *Id.* The STB's investigation will determine, in part, whether the "failure to achieve minimum standards" is "attributable to a rail carrier's failure to provide preference to Amtrak over freight transportation." *Id.* § 24308(f)(1)-(f)(2). In the Government's view, the ability to initiate an enforcement proceeding is not regulatory

authority. But the fact is these "metrics and standards lend definite regulatory force to an otherwise broad statutory mandate." *AAR*, 721 F.3d at 672. Certainly, the preference is the ultimate source of freight operators' liability, but, as we said before, "the metrics and standards are what channel its enforcement." *Id.* In public comments, FRA and Amtrak acknowledged the STB "is the primary enforcement body *of the standards*." *Id.*

The extent to which the metrics and standards could affect ultimate damages and relief, if at all, in a given case is not clear to us. *See* 49 U.S.C. § 24308(f)(3)(A). We need not know that, however, to see that the statute gives Amtrak the authority to develop metrics and standards—constrained very partially, as discussed below, by the FRA and the arbitrator— that increase the risk that STB will initiate an investigation, thereby increasing the number of cases in which the STB may find a failure to provide Amtrak its statutory preference. "Because obedience to the metrics and standards materially reduces the risk of liability, railroads face powerful incentives to obey. That is regulatory power." *Dep't of Transp.*, 135 S. Ct. at 1236 (Alito, J., concurring) (citation omitted).

Accordingly, the Government's arguments are unpersuasive. Both PRIIA's mandate that freight operators incorporate the metrics and standards "to the extent practicable" and its grant of authority to STB to investigate freight operators in the event the metrics and standards are not satisfied confirm that, in fact, PRIIA grants Amtrak, a self-interested entity, power to regulate its competitors.

## C

The syllogism we introduced at the outset is complete. Because PRIIA endows Amtrak with regulatory authority

over its competitors, that delegation violates due process. Amtrak is required both to "maximize its revenues" and to develop new performance metrics, a set of responsibilities that, if adhered to, will inevitably boost Amtrak's profitability at the expense of its competitors. The actual metrics Amtrak produced in this instance were unfavorable to the freight operators. The on-time performance standards required the freight railroads to modify their operations, causing delays. AAR Br. 32. On some routes, adhering to the standards was simply impractical, exposing those rail operators to investigation by the STB and financial penalties payable to Amtrak. *Id.* Armed with coercive regulatory power, Amtrak wields a weapon of considerable advantage in its competitive battle for scarce track. And while the Constitution may grudgingly accept the reality of self-interestedness, it does not endorse it as an unmitigated good.

Congress delegated its legislative power to an entity that it designed to be the *opposite* of "presumptively disinterested." *Carter Coal*, 298 U.S. at 311. Like coal competitors, whose "diversity of view[s]" concerning the challenges of the industry "[arose] from their conflicting and even antagonistic interests," *id.*, the antagonistic interests of freight operators and Amtrak transform the development of new performance metrics and standards into an unfair game of zero sums. While freight operators and Amtrak may not directly compete for customers, they compete for scarce track, and Amtrak's authority to manipulate that competition entails the power to modify freight schedules to accommodate Amtrak trains, reschedule maintenance work, or reroute freight traffic. Put simply, PRIIA entrusts Amtrak "with the power to regulate the business . . . of a competitor." *Id.* "[A] statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property" and transgresses "the very nature

of" governmental function. *Id.*

None of the Government's numerous counterarguments persuade us otherwise. First, the Government argues *Carter Coal* is distinguishable because unlike the empowered private coal producers, the federal government has considerable oversight and control over Amtrak. There's no doubt this is true. But then, there was also no suggestion that it was the coal producers' lack of accountability to government oversight that offended the *Carter Coal* Court either. Instead, what was offensive about the statute was its "attempt[] to confer" the "power to regulate the business of another, and especially of a competitor." *Id.* Subjecting the coal producers to government oversight would not have cured a grant of regulatory power antithetical to the very nature of governmental function.[4]

Second, the Government suggests the FRA's required assent to any proposed metrics operates as an "independent check" on Amtrak's self-interestedness. To be sure, PRIIA does require Amtrak and FRA to "jointly" develop the metrics, but it's far from clear whether and in what way FRA "checks" Amtrak. PRIIA § 207(a). Both are subdivisions

---

[4] We recognize that in some cases the Court has upheld arrangements under which regulatory burdens can be imposed by the joint action of a self-interested group and a government agency. *See Currin v. Wallace*, 306 U.S. 1, 6, 15-16 ((1939); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940). Those cases are inapplicable here, however, because the FRA's authority to hold the line against overreaching by Amtrak is undermined by the power of the arbitrator, an individual who is appointed, and as we show below appointed unconstitutionally, by the STB. *See* Section IV, *supra* (explaining that any disputes between Amtrak and the FRA are to be resolved by an arbitrator through binding arbitration).

within the same branch and work in tandem to effectuate the goals Congress has set. Nowhere in the scheme is there any suggestion that FRA must safeguard the freight operators' interests or constrain Amtrak's profit pursuits.[5] Moreover, FRA is powerless to overrule Amtrak. As joint developers, they occupy positions of equal authority. When there is intractable disagreement between the two, the matter is resolved by an arbitrator, who may ultimately choose to side with Amtrak. FRA cannot keep Amtrak's naked self-interest in check, and therefore the requirement of joint development does not somehow sanitize the Act.

Third, the Government cites *Friedman v. Rogers*, 440 U.S. 1 (1979), as proof that some forms of bias are inoffensive. Gov. Br. 24–25. *Friedman* involved a Texas statute requiring a majority of the state optometry board be members of the Texas Optometric Association (TOA), which is restricted to optometrists who comply with state ethics requirements. 440 U.S. at 6. The plaintiffs, who were ineligible for membership because their business model conflicted with those ethics requirements, alleged the Board was unconstitutionally biased against them. *Id.* The Court disagreed, stating they had "no constitutional right to be regulated by a Board that is sympathetic to the commercial

---

[5] Nor does the FRA's charter suggest it is a steward for the interests of freight operators. *See generally* 49 U.S.C. § 103. The charter requires FRA "consider the assignment and maintenance of safety as [its] highest priority," *id.* § 103(c), and requires, as additional duties, that it "develop and enhance partnerships with the freight and passenger railroad industry"; "ensure that programs and initiatives . . . benefit the public and work toward achieving regional and national transportation goals"; and "facilitate and coordinate efforts to assist freight and passenger rail carriers . . . by providing neutral assistance at the joint request of affected rail service providers," *id.* § 103(j).

practice of optometry." *Id.* at 18. Here, the Government asserts that *Friedman* "cannot be reconciled with" a due process reading of *Carter Coal*. Gov. Br. 24. But the *Friedman* plaintiffs never alleged the Board members would act out of self-interest instead of fairness, only that the board's composition itself was unfair. The Supreme Court rejected the idea anyway, noting there was "no support in the record" that "the TOA members on the Board will act in excess of their authority by discouraging lawful advertising by optometrists," a decision that would have evidenced naked self-interest. *Friedman*, 440 U.S. at 19 n. 20.

Finally, the Government argues the Constitution does not prohibit Congress from empowering Amtrak to develop metrics and standards because Congress itself could have developed the metrics and standards or could have directed FRA to develop them alone. Gov. Br. 25. Perhaps. But notice that, in either of these alternative scenarios, the power to regulate freight operators would be in the hands of "official bod[ies], presumptively disinterested." *Carter Coal*, 298 U.S. at 311. Pointing to Congress or FRA's capacity to develop these metrics is nothing but a red herring—the due process question *Carter Coal* and the freight operators put before us in this appeal centers on the propriety of self-interested actors exercising regulatory power.

\* \* \*

The Supreme Court's conclusion that Amtrak is a government entity resolved the nondelegation issue that was the primary focus of our earlier decision. But it left a due process one. Make no mistake; our decision today does not foreclose Congress from tapping into whatever creative spark spawned the Amtrak experiment in public-private enterprise. But the Due Process Clause of the Fifth Amendment puts

Congress to a choice: its chartered entities may *either* compete, as market participants, *or* regulate, as official bodies. After all, "[t]he difference between producing . . . and regulating . . . production is, of course, *fundamental*." *Id.* (emphasis added). To do both is an affront to "the very nature of things," especially due process.

Next, we consider the other challenge to PRIIA preserved for our review: whether the arbitration provision violates the Appointments Clause.

## VI

As the foregoing analysis suggests, among the Framers' chief concerns at the constitutional convention were questions of *who* should be permitted to exercise the awesome and coercive power of the government. Tyrannous abuse of that power precipitated revolution against Great Britain. Overly restrictive access to it crippled our young nation under the Articles of Confederation. The novel equipoise the Constitution struck was to vest the legislative, executive, and judicial powers in independent branches of government and then empower each to check the others.

The Appointments Clause, at issue here, is one of "the significant structural safeguards of th[at] constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). It requires every "Officer of the United States" exercising "significant authority pursuant to the laws of the United States" to be appointed in a specific manner, as prescribed in Article II, section 2, clause 2. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). The prescribed manner differs depending on the type of "Officer" to be appointed. "Principal officers" are appointed by the President with the "advice and consent of the Senate," ensuring "public

accountability for both the making of a bad appointment and the rejection of a good one." *Edmond*, 520 U.S. at 660. But Congress, for the purpose of "administrative convenience," *id.*, may vest the exclusive appointment power of inferior officers—those "whose work is directed and supervised at some level" by principal officers, *id.* at 663— in "the President alone, in the Courts of Law, or in the Heads of Department," *id.* at 660. These limitations on the appointment power "ensure that those who wield[] it [are] accountable to political force and the will of the people." *Freytag*, 501 U.S. at 884.

The freight operators claim PRIIA's arbitration provision violates this important safeguard. PRIIA requires that, in the event Amtrak and FRA cannot agree, either party "may petition the Surface Transportation Board to appoint an arbitrator to assist the parties in resolving their disputes through binding arbitration." PRIIA § 207(d). Conspicuous by its absence in this provision is any mention whether the appointed arbitrator is a private individual or public official. But in the freight operators' view, it hardly matters, as the provision is unconstitutional regardless. Either the arbitrator is a private individual and the clause unlawfully deputizes a private person to issue binding regulations, or she is a public official and her appointment by the STB, rather than "the President with the advice and consent of the Senate," violates the Appointments Clause.[6]

---

[6] The Government contends it is improper to reach this question because the arbitration provision was "never invoked." Gov. Br. 40–42. For reasons we explained in our previous opinion, this argument fails to acknowledge how the provision "still polluted the rulemaking process" by "stack[ing] the deck in favor of compromise." *AAR*, 721 F.3d at 674; *see also Dep't of Transp.*, 135 S. Ct. at 1236 (Alito, J., concurring) ("[W]hen Congress enacts a compromise-forcing mechanism, it is no good to say that the

We needn't concern ourselves much here with the amici's arguments concerning the propriety of giving regulatory power to private individuals. Our prior opinion detailed extensively why private entities cannot wield the coercive power of government, *AAR*, 721 F.3d at 670–74, and seeing as the Supreme Court reversed on other grounds, we stand by that analysis. *See also Dep't of Transp.*, 135 S. Ct. at 1237 (Alito, J., concurring) ("When it comes to private entities [exercising governmental powers], however, there is not even a fig leaf of constitutional justification."). More importantly, even assuming, as the Government insists, the STB appoints a "governmental arbitrator" rather than a private one, the appointment is nonetheless unconstitutional.

## A

Antecedent to deciding the ultimate issue, we first turn to a central premise of the freight operators' claim, namely that the arbitrator is an "Officer of the United States." After all, the Appointments Clause is concerned only with the appointment of officers, not nonofficers. *See Edmond*, 520 U.S. at 662. The question is whether the "appointee exercis[es] significant authority pursuant to the laws of the United States." *See Buckley*, 424 U.S. at 126; *see also Edmond*, 520 U.S. at 662 (noting the "significant authority" test "marks, not the line between principal and inferior officer . . . but rather . . . the line between officer and nonofficer").

To see why we answer this question with a resounding "yes," it is helpful to take stock of the arbitrator's duty. The arbitrator is called upon to resolve any impasse between

mechanism cannot be challenged because the parties compromised."); *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264–65 (1991).

Amtrak and FRA through "binding arbitration." PRIIA § 207(d). In other words, it is the arbitrator's responsibility to render a final decision regarding the content of the metrics and standards. That decision would appear in the Federal Register, *see Metrics and Standards for Intercity Passenger Rail Service under Section 207 of the Passenger Rail Investment and Improvement Act of 2008*, 75 Fed. Reg. 26839, 26839 (2010), and would immediately impact the freight railroads obligations vis-à-vis Amtrak. The arbitrator's power to alter the railroad industry through final agency action constitutes "significant authority pursuant to the laws of the United States." *See Edmond*, 520 U.S. at 665 (noting the judges in question "have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers"); *see also Dep't of Transp.*, 135 S. Ct. at 1239 (Alito, J., concurring) (asserting that "nothing final should appear in the Federal Register unless a Presidential appointee has at least signed off on it").

For these reasons, the STB's appointed arbitrator qualifies as an "Officer of the United States," and "must, therefore, be appointed in the manner prescribed by" the Appointments Clause. *See Buckley*, 424 U.S. at 126. We must consider, then, whether PRIIA—which vests the STB with power to appoint an arbitrator—accords with the manner prescribed by the Constitution.

B

Perhaps the best explanation of the Appointments Clause is found in the Supreme Court's 1878 decision in *United States v. Germaine*, 99 U.S. 508 (1878). The Court stated:

The Constitution for purposes of appointment very clearly divides all its officers into two classes. The

primary class requires a nomination by the President and confirmation by the Senate. But foreseeing that when offices became numerous, and sudden removals necessary, this mode might be inconvenient, it was provided that, in regard to officers inferior to those specially mentioned, Congress might by law vest their appointment in the President alone, in the courts of law, or in the heads of departments. That all persons who can be said to hold an office under the government about to be established under the Constitution were intended to be included within one or the other of these modes of appointment there can be but little doubt.

*Id.* at 509–10.

Accordingly, the starting place for assessing the constitutionality of an officer's appointment is determining to which class the officer belongs. Here, if the arbitrator is a principal officer, her appointment would clearly violate the constitution because PRIIA vests the appointing power in the STB alone, not the President with the advice and consent of the Senate. *See* PRIIA § 207(d). Likely in anticipation of this obvious defect, the Government characterizes the arbitrator's authority as "confined to the single impasse over the metrics and standards," and asserts it is therefore of such a "limited nature" that it "would have made the arbitrator an inferior, rather than a principal, officer." Gov. Br. 46. If the Government's assertion were correct, the appointment would be valid, since the STB is a "department" within the meaning of the Clause. *See* 49 U.S.C. § 1301 (a), (b) (establishing the STB as "an independent establishment" whose board members are "appointed by the President"); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 511 (2010) (defining a department as "a freestanding component

of the Executive Branch, not subordinate to or contained within any other such component").

However, as the Supreme Court's opinion in *Edmond* clarified, the degree of an individual's authority is relevant in marking the line between officer and nonofficer, not between principal and inferior officer. *Edmond*, 520 U.S. at 662. Recognizing its cases had not yet "set forth an exclusive criterion for distinguishing between principal and inferior officers," *id.* at 661, the *Edmond* Court identified the dispositive feature as whether an officer is "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate," *id.* at 663. Thus, the Government's reliance on the "limited nature" of the arbitrator's duties confuses a question of supervision for one of authority.

And while it may seem peculiar to demand "primary class" treatment for a position as banal as the PRIIA arbitrator, it also seems inescapable. Nowhere does PRIIA suggest the arbitrator "is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." PRIIA doesn't provide any procedure by which the arbitrator's decision is reviewable by the STB. Instead, it empowers the arbitrator to determine the metrics and standards "through binding arbitration." *See Dep't of Transp.*, 135 S. Ct. at 1239 (Alito, J., concurring) ("As to that 'binding' decision, who is the supervisor?"). The result? A final agency action, the promulgation of metrics and standards as though developed jointly by Amtrak and the FRA. Without providing for the arbitrator's direction or supervision by principal officers, PRIIA impermissibly vests power to appoint an arbitrator in the STB.

V

> Train schedules are a matter of pride and of apprehension to nearly everyone. When, far up the track, the block signal snapped from red to green and the long, stabbing probe of the headlight sheered the bend and blared on the station, men looked at their watches and said, 'On time.' There was pride in it, and relief too. The split second has been growing more and more important to us. And as human activities become more and more intermeshed and integrated, the split tenth of a second will emerge, and then a new name must be made for the split hundredth, until one day, although I don't believe it, we'll say, 'Oh, the hell with it. What's wrong with an hour?' . . . One thing late or early can disrupt everything around it, and the disturbance runs outward in bands like the waves from a dropped stone in a quiet pool.

JOHN STEINBECK, EAST OF EDEN 533 (Penguin Books 2002).

It may be said that PRIIA's architects shared Steinbeck's pride in the punctuality of train schedules. But as we've shown, there are limits to how far Congress may go to ensure Amtrak's on-time performance. The Constitution's drafters may not have foreseen the formidable prerogatives of the administrative state, but the Due Process Clause effectively guarantees the regulatory power of the federal government will be wielded by "presumptively disinterested" and "duly appointed" actors who, in exercising that awesome power, are beholden to no constituency but the public good. Because PRIIA grants this power to the economically self-interested Amtrak and to an unconstitutionally appointed arbitrator, it transgresses that vital guarantee. We therefore

*Reverse.*